

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Leo J. Wise* | *Suite 400* | *DIRECT: 410-209-4909* |
| *Assistant United States Attorney* | *36 S. Charles Street* | *MAIN: 410-209-4800* |
| *Leo.Wise@usdoj.gov* | *Baltimore, MD 21201-3119* | *FAX: 410-962-3091* |

June 28, 2017

Dennis Edward Boyle
Boyle & Frost
888 Bestgate Rd Suite 400
Annapolis, MD 21401

Re: *United States v. Jemell Rayam*, Cr. No. 17-106

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by July 5, 2017, it will be deemed withdrawn. The terms of the agreement are as follows:

Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the indictment now pending against him in *United States v. Gondo, et al*, Cr. No. JKB 17-106, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a. First, that an enterprise existed as alleged in the indictment;

    b. Second, that the enterprise affected interstate or foreign commerce;

1

    c.  Third, that the defendant was associated with or employed by the enterprise; and

    d.  Fourth, that the defendant knowingly and willfully became a member of the conspiracy.

## Penalties

3.  The maximum sentences provided by statute for the offense to which the Defendant is pleading guilty are as follows: a 20-year term of incarceration, 3 years of supervised release and a fine of fine not more than twice gross proceeds derived from the offense. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a.  If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the

---

[1]    Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

i. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant

3

nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt. In addition, Pursuant to U.S.S.G. § 1B1.2 the parties stipulate and agree that the guideline for robbery should be used to calculate the Defendant's advisory guideline calculation.

| | | |
|---|---|---|
| a. | Base Offense Level (U.S.S.G. § 2B3.1(a)) | 20 |
| b. | Firearm Possessed (U.S.S.G. § 2B3.1(b)(2)(C)) | +5 |
| c. | Physical Restraint To Facilitate Commission of Offense (U.S.S.G. § 2B3.1(b)(4)(B)) | +2 |
| d. | Loss > $20,000 (U.S.S.G. § 2B3.1(b)(7)(B)) | +1 |

The parties also agree to the following adjustments to the offense level based on the defendant's role in the offense

| | | |
|---|---|---|
| a. | Abuse of Position of Trust (U.S.S.G. § 3B1.3) | +2 |
| b. | Obstructing or Impeding the Administration of Justice (U.S.S.G. § 3C1.1) | +2 |

Subtotal    32

4

7. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct.

8. This Office will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.

9. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

10. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

11. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

12. The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range.

### Obligations of the United States Attorney's Office

13. At the time of sentencing, this Office will recommend a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

14. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any uncharged conduct.

### Restitution

15. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the

actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Collection of Financial Obligations

16. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

17. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

18. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

19. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

    b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised.

6

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

20. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

21. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if

7

the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

22. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

By: _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

8

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_____          _____
10/4/2019
Date                             Jemell Rayam


I am the Defendant's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_____          _____
10/4/2019
Date                             Dennis Boyle, Esq.

9

## ATTACHMENT A
## STATEMENT OF FACTS

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence the guilt of the Defendant on the charges of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).

This Office and the Defendant understand, agree and stipulate to the following statement of facts and the Defendant acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

1. The Defendant, Jemell Rayam (RAYAM), joined the Baltimore Police Department ("BPD") an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, on July 12, 2005. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

2. The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

3. The Defendant was assigned to the GTTF on or about June 13, 2016.

4. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

5. The purposes of the Defendant and his co-defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud.

6. Among the means and methods by which the Defendants and others pursued their illegal purposes were the following:
   a. detaining individuals and stealing money, property and narcotics from them;
   b. entering residences and stealing money, property and narcotics from the owners and occupants of those residences;
   c. conducting traffic stops of vehicles and stealing money, property and narcotics from the vehicle occupants;
   d. swearing out false affidavits to obtain search warrants in order to steal money, property and narcotics;

     e. preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees and charging documents to conceal the fact that the defendants stole money, property and narcotics from individuals;

     f. evading court proceedings involving arrestees from whom the defendants stole money, property and narcotics in order avoid questioning regarding the stolen money, property and narcotics; and

     g. obstructing and evading law enforcement efforts to uncover their criminal conduct, including,

          i. alerting one another to potential investigations into their criminal conduct,

          ii. coaching one another to give false testimony to investigators from the Internal Investigations Division of the BPD,

          iii. turning off their body cameras to avoid recording law enforcement encounters with civilians in which they were participants; and

     h. defrauding the BPD and the State of Maryland by submitting false and fraudulent time and attendance records in order to obtain salary and overtime payments for times when the defendants did not work.

7. The defendant agrees that he associated with the enterprise described in the indictment and knowingly became a member of the conspiracy described in the indictment.

## Robberies

8. While serving as a BPD officer, RAYAM robbed civilians he detained and in some cases arrested and stole money and drugs from them. RAYAM did this beginning in at least 2009 or 2010 when he joined the GTTF. At times, RAYAM shared the proceeds with co-defendants Momodu GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"), Marcus Taylor ("TAYLOR"), Sergeant A and others, and on other occasions, he kept all of the proceeds for himself. The practice of stealing from detainees and arrestees is referred to as "taxing" them, a term RAYAM himself used when he robbed S.S. in September 2016 and described in more detail below.

9. RAYAM also sold, through associates of his, drugs that JENKINS gave him and split the proceeds of those sales with JENKINS. JENKINS obtained the drugs by robbing detainees and arrestees.

10. RAYAM also robbed detainees and arrestees with another police officer, who was not a member of the GTTF. RAYAM and this other police officer would falsely represent that they had a search warrant, when they did not, in order to gain access to someone's home and would then steal money and other things of value.

11. RAYAM robbed members of the community with other associates who were not police officers.

12. RAYAM also robbed drug dealers whom an associate of his identified. This associate would tell RAYAM when a drug dealer had a significant amount of cash in their home and when the associate knew the drug dealer would not be in the home. RAYAM would then rob the drug dealer's home with the assistance of other associates of his who were not police officers.

13. RAYAM admits that he participated in the specific robberies listed below, among others. Further, RAYAM admits he was armed with his BPD service firearm during the commission of these robberies, that individual victims of the robberies were physically restrained in some cases to facilitate the commission of the offense, and that he authored false and fraudulent incident reports and other official documents in some cases in order to conceal his and his co-defendants' criminal conduct and otherwise obstruct justice.

### a. June 27, 2014, Robbery of D.C. and J.S.'s Home

14. On June 27, 2014, at approximately 4 p.m., RAYAM, GONDO and Sergeant A executed a search and seizure warrant at a store that sold bird seed. No illegal contraband or firearms were found at the location.

15. The store owners, a married couple, D.C. and J.S., had $20,000 in cash at the store. They intended to use that money to pay off tax liabilities they owed on two homes.

16. RAYAM and GONDO learned that the money was in the location. RAYAM wanted to steal the money but GONDO did not, fearing that the store owner, who appeared to be a legitimate business owner, would report the theft to law enforcement.

17. RAYAM, GONDO and Sergeant A left the location.

18. Later that day, RAYAM contacted two associates of his, T.F. and D.R. RAYAM, T.F. and D.R. agreed that the three of them would rob D.C. and J.S.'s home, where they believed they had returned with the $20,000. RAYAM gave T.F. his (RAYAM's) police tactical vest and sent T.F. and D.R. into the home. T.F. and D.R. presented themselves as police officers and seized the $20,000 that D.C. and J.S. had in fact brought home with them from the store. RAYAM remained in a car outside the home so that if D.C. and J.S. called the police, RAYAM could intercept the police officers that responded and pretend to be responding to the incident himself.

19. T.F. and D.R. split $12,000 of the $20,000 they stole with RAYAM.

### b.  March 11, 2015, Robbery of G.W.

20. On March 11, 2015, RAYAM and GONDO and Sergeant A, acting in their capacity
as police officers, entered a residence where G.W. was staying.  Sergeant A also
brought his son, who was not a police officer, to the search scene.

21. While RAYAM, GONDO, Sergeant A and Sergeant A's son were searching a
bedroom they discovered a large quantity of cash.  RAYAM, GONDO and Sergeant
A each took some of the cash.  RAYAM took between $8,000 and $10,000.

22. In order to conceal his criminal conduct from law enforcement, RAYAM did not
prepare an incident report that disclosed that he had seized this cash from G.W. and
did not submit any of the money he had stolen from G.W. to BPD.

### c.  April 3, 2015 Robbery of D.M.

23. On April 3, 2015, RAYAM, GONDO, and Sergeant A, acting in their capacity as
police officers, entered a residence where D.W. was staying.

24. RAYAM, GONDO, and Sergeant A searched an upstairs bedroom closet and located
approximately $7,000 in cash in the closet.  RAYAM, GONDO, and Sergeant A took
the cash and divided it up.

25. RAYAM, GONDO, and Sergeant A did not submit any of the money they stole to
BPD.

### d.  July 31, 2015, Robbery of Z.N.

26. On July 31, 2015, RAYAM, GONDO and Sergeant A, acting in their capacity as
police officers, entered a residence where Z.N. was staying.

27. While RAYAM and GONDO were searching the house they discovered a quantity of
cash.  GONDO and RAYAM took some of the cash.

28. After they left the residence, RAYAM, GONDO and Sergeant A went to Mother's, a
restaurant in Baltimore City, where RAYAM gave Sergeant A his portion of the
stolen money.

29. In order to conceal his criminal conduct from law enforcement, RAYAM did not prepare an incident report that disclosed that he had seized this cash from Z.N. and did not submit any of the money he had stolen from Z.N. to BPD.

### e.  October 5, 2015 Robbery of A.A. and T.C.

30. On October 5, 2016, RAYAM, GONDO and Kyle Wells, ("WELLS") robbed A.A. and T.C. · A.A. was a drug dealer and GONDO had learned that he had money and drugs in his apartment. Prior to the robbery, RAYAM and GONDO placed a tracking device on A.A.'s car without court authorization so that they could rob A.A.'s apartment when he was not home.

31. On October 5, 2016, the RAYAM and WELLS forcibly entered A.A.'s apartment while GONDO acted as a look-out. T.C. was in the apartment when RAYAM and WELLS entered. RAYAM was wearing a ski mask and WELLS had a bandana over his face. RAYAM was armed with a BPD-issued firearm when he forcibly entered the apartment.

32. RAYAM and WELLS stole a Rolex watch, a firearm, $12,000 to $14,000 in cash and at least 800 grams of heroin.

33. After the robbery, RAYAM, GONDO and WELLS split the money they had stolen. WELLS took the Rolex, the gun and the drugs. WELLS sold some of the drugs and gave RAYAM and GONDO a portion of the proceeds. WELLS then gave the RAYAM a quantity of drugs that he had been unable to sell, which RAYAM in turn sold through an associate.

### f.  February 10, 2016, Robbery of P.E.

34. On February 10, 2016, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, entered a residence where P.E. was staying. When the officers entered the residence, P.E. was counting a quantity of cash as he sat on his bed in his bedroom.

35. After taking P.E. downstairs, GONDO, RAYAM and Sergeant A stole some of the cash that P.E. had been counting, and they divided the money and received a couple thousand dollars each.

### g.  February 23, 2016, Robbery of B.C.

36. On or about February 23, 2106, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, executed a search and seizure warrant.

37. GONDO, RAYAM and Sergeant A stole $7,000 from B.C.'s bedroom after placing her in handcuffs. After the robbery, GONDO, RAYAM and Sergeant A split the money that had been taken from B.C.'s bedroom.

### h.  May 11, 2016, Robbery of N.D.

38. On May 11, 2016, Detectives GONDO, RAYAM and HERSL, acting in their capacity as police officers, conducted a traffic stop of N.D. and M.A.

39. During the traffic stop, RAYAM stole approximately $700 from N.D.

### i.   May 28, 2016, Robbery of A.C.

40. On or about February 23, 2106, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, executed a search and seizure warrant.

41. GONDO, RAYAM and Sergeant A stole at least $700 from A.C.'s bedroom, which they split up while executing the warrant.

42. In order to conceal his criminal conduct from law enforcement, RAYAM did not prepare an incident report that disclosed that he had seized this cash from A.C.'s bedroom and did not submit any of the money he had stolen from A.C. to BPD.

### j.   Robbery and Subsequent Sale of Marijuana and Firearm

43. After he became the officer-in-charge of the GTTF, JENKINS approached RAYAM and asked him to sell drugs that he, JENKINS, had stolen from detainees. RAYAM agreed, sold the drugs JENKINS gave him and shared the proceeds with JENKINS.

44. In fall 2016, JENKINS maintained that RAYAM owed him money for drugs that JENKINS had given him to sell.

45. JENKINS, GONDO and RAYAM conducted a traffic stop on Dickey Road near Forest Park. The incident was never reported. RAYAM and GONDO recovered marijuana from the driver's car.

46. RAYAM, GONDO and JENKINS then went to the driver's house and recovered additional marijuana and a firearm. JENKINS told RAYAM to sell the marijuana and the firearm in order to pay JENKINS the money that JENKINS believed that RAYAM owed him.

47. GONDO subsequently arranged for an associate of his, who was a drug dealer, to buy the firearm and the marijuana. That associate of GONDO's gave RAYAM money for the firearm and marijuana.

### k. July 8, 2016, Robbery of R.H. and N.H.

48. On July 8, 2016, RAYAM submitted an affidavit, under oath, to a Maryland State Circuit Court Judge, asking for authorization to search R.H. and N.H.'s home. The affidavit falsely stated that "[o]n July 5, 2016 Sgt. Jenkins, Det. Rayam, and Det. Gondo conducted a full day of surveillance on [R.H.]. At approximately 0940 hrs. R.H. was observed exiting [his residence] and entering into his [vehicle]. At 1030 hrs. R.H. arrived at [a location in Elkridge, Maryland] and stayed for approximately 1 hr. and 20 min." RAYAM and GONDO were both at home in their residences when they claimed to be conducting surveillance of R.H.

49. On July 8, 2016, at approximately 3:00 p.m., GONDO called J.C. During the call GONDO said, "Hey John [J.C.], we're pulling them over." J.C. replied, "All right. I'm waiting on you." RAYAM said, "He [JENKINS] gave the order. We pull them over, bring them back to the academy. That's per, Sergeant Jenko [JENKINS]." J.C. then said, "All right. I got you. Hold on."

50. Shortly thereafter, RAYAM and his co-defendants Daniel Hersl ("HERSL") and GONDO detained R.H. and N.H. without lawful authority at co-defendant WAYNE JENKINS' direction. R.H. and N.H. were stopped and were placed in handcuffs but RAYAM and his co-defendants had no basis on which to arrest them. When RAYAM took R.H. out of his car, RAYAM asked him, "where's the money?" R.H. had approximately $3,400 on his person which RAYAM stole. RAYAM later gave GONDO a portion of the funds he stole from R.H. when R.H. was initially detained.

51. Also at co-defendant JENKINS's direction, RAYAM, GONDO and HERSL then transported R.H. and N.H., to a BPD office located on Northern Parkway in Baltimore, Maryland, referred to as the "Barn" so that he could be interrogated.

52. At approximately 3:11 p.m., while R.H. were being transported to the Barn, GONDO called JENKINS. During the call, GONDO said, "Hey, what's up. We, ah, we headed down now [to a BPD off-site facility]. We got, um, got the package [R.H. is in custody]." JENKINS said, "Hold on one second, hey, hey, he's [R.H.] in the car with you?" GONDO replied, "Yeah, I got, I got the, um, male [R.H.] and they got the female [N.H.]." JENKINS said, "Okay, hey, uh, did you tell them anything at all?" GONDO replied, "No." JENKINS continued, "All right. Just tell them you gotta wait for the U.S. Attorney . . ." GONDO, "Yeah, we gonna meet up with you and [unintelligible]." JENKINS said, "Okay, and when I get there, treat me like I'm the fucking U.S. Attorney. Like, hey Sir, how are you, we got our target in pocket. And

then introduce me as the U.S. Attorney." GONDO said, "I got you."

53. Once at the barn and during this interrogation, R.H. told JENKINS that he had a large sum of money at his home in Westminster, Maryland, but denied having any drugs or guns at the residence.

54. RAYAM, JENKINS, GONDO and HERSL then transported R.H. and N.H. to their home.

55. On the way to R.H. and N.H.'s home, JENKINS contacted the Maryland State Police (MSP) because RAYAM, JENKINS, HERSL and GONDO had no authority to execute a search and seize warrant in Carroll County, Maryland.

56. Once at R.H. and N.H.'s home, RAYAM, HERSL, JENKINS and GONDO commenced searching the home before MSP arrived. RAYAM located a heat sealed package containing cash and a sum of loose cash. RAYAM and his co-defendants stole approximately $20,000 in loose currency. RAYAM and his co-defendants divided the stolen cash among themselves later in the evening at a bar in Baltimore City.

57. In order to conceal their illegal conduct, RAYAM authored a false Incident Report for the arrest of R.H. and N.H. and the subsequent search of their home that was filed with the BPD. Above his signature, RAYAM certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, RAYAM failed to disclose the $3,400 that had been stolen from R.H. during the traffic stop and the $20,000 that was stolen from R.H. and N.H.'s home.

### I. August 8, 2016, Robbery of D.A.

58. On or about August 8, 2016, RAYAM went to a storage unit to secure it while GONDO and J.C. worked to obtain a search warrant to search the unit. JENKINS, HERSL and J.C. had stopped an individual who had been using the storage unit to store drugs and had arrested him. JENKINS and HERSL were with RAYAM at the storage unit.

59. While they were waiting for GONDO and J.C. to return with the search warrant, HERSL asked RAYAM to go with him to a 7-Eleven store to buy some drinks. HERSL took RAYAM to the 7-Eleven and then to the parking lot of Archbishop Curley High School. In the parking lot of the school, HERSL gave RAYAM money HERSL had stolen from the arrestee's vehicle.

17

**m. August 24, 2016, Robbery of J.B.**

60. On or about August 24, 2016, at 10:45 a.m., Detectives HERSL, GONDO and RAYAM, acting in their capacity as police officers, stopped J.B. on the street.

61. HERSL ordered J.B. to get into the BPD vehicle that he, HERSL, GONDO and RAYAM, were operating. RAYAM then asked J.B. for the number of his apartment and asked him, "is there a gun in there" to which J.B. responded, "[n]o, there's not," and then RAYAM asked him, "[i]s there any large sums of money," to which J.B. responded "no."

62. RAYAM took J.B.'s car keys and conducted a search of J.B.'s car, which J.B. had just exited. RAYAM then took J.B. into his home.

63. At 10:54 p.m., GONDO called JENKINS. GONDO told JENKINS that, "[w]e in the house now, man. If you want to come over." JENKINS asked GONDO, "you guys getting a warrant," to which GONDO replied, "I'm not too sure what Rayam's gonna do yet." JENKINS then asked for the address and said he would "see [them] in a second." At 11:02 p.m., JENKINS called GONDO while he was driving to their location. JENKINS asked GONDO, "are you gettin' a consent," to which RAYAM replied "[w]e gonna work on that. Yeah, we gonna work on that."

64. Once inside the house, RAYAM, in the presence of GONDO and HERSL, stole $1,500 from J.B., which J.B. had earned as a maintenance supervisor at a nursing home in Baltimore City. J.B. intended to use this money, which was in cash, to buy a money in order to pay his rent.

65. In order to conceal their illegal conduct, RAYAM authored a false Incident Report that was filed with the BPD concerning property seized from J.B. Above his signature, RAYAM certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, RAYAM failed to disclose the $1,500 that had been stolen from J.B.

**n. September 7, 2016, Robbery of S.S.**

66. On or about September 7, 2016, Sergeant JENKINS and Detectives RAYAM, HERSL, TAYLOR, GONDO and WARD, acting in their capacity as police officers, stopped S.S. as he attempted to leave the parking lot of a storage facility in Baltimore City. TAYLOR told S.S. that they had a warrant to search his storage unit when, in fact, they did not. RAYAM and TAYLOR then went into S.S.'s storage unit and took a sock containing cash from the unit and stole money from it. RAYAM then gave the sock back to S.S. and told him to leave. S.S. was never charged with committing a crime.

67. At the scene of the incident, inside a BPD vehicle, RAYAM described to GONDO how he told JENKINS that he had only "taxed" S.S., a "little bit" referring to only stealing some of S.S.'s cash and that because they had not arrested S.S., "[h]e, [S.S.] won't say nothing" to other law enforcement authorities.

68. To conceal the robbery and extortion, RAYAM and TAYLOR did not prepare an Incident Report regarding the arrest. Further, RAYAM and TAYLOR and M.W. did not submit to BPD the money stolen from S.S.

    **o. October 3, 2016, Robbery of G.H.**

69. On or about October 3, 2016, Sergeant JENKINS and Detectives RAYAM, GONDO, TAYLOR, HENDRIX and WARD, acting in their capacity as police officers, engaged in a high-speed police chase of a vehicle driven by G.H. G.H. fled and threw over 9 ounces of cocaine out the window of his vehicle before crashing his vehicle near Mondawmin Mall.

70. At the scene of the stop, JENKINS retrieved the cocaine and gave it to RAYAM. JENKINS told J.R. to sell the cocaine and give JENKINS the proceeds, which J.R. agreed to do.

## Coaching One Another in Advance of Internal Investigation Division (IID) Interviews

71. On or about September 7, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. GONDO asked RAYAM if he was going to the Internal Investigations Division (IID) to be interviewed. RAYAM told GONDO he had to give IID a report on the 15th. GONDO responded that he told "Sarge" not to, "say anything about the entry."

72. On or about September 13, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed how what is recorded on their body cameras will "come back to bite [them]." RAYAM told GONDO that he was going to meet up with Sergeant A. to "coach him" before he is interviewed by IID.

### Turning Off their Body Cameras

73. On or about September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed an incident where JENKINS was fighting with a civilian and "hit the phone out of her hand." GONDO told RAYAM, "I turned the camera off" referring to his body camera. RAYAM responded, "Oh yeah, fuck that shit" and then said "so basically you were never here."

**Planning Additional Robberies**

74. On September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. RAYAM told GONDO, "He [JENKINS] told me about that, ah, he put me onto some big shit, yo, so I'm gonna start lookin' into this dude, I was tellin' him whatchu you goin' doin' in pockets [referring to robbing people of money they kept in their pockets], it's a fuckin' waste of time man . . . But he's just like, yo, you know, um, I got big dude, I was tired of putting my name on it, I was just goin' to give it to you motherfuckers." GONDO then asked if JENKINS provided the name of the "big dude" that they could rob. RAYAM responded,

> Naw, he said he's tired on puttin' his name on shit [referring to JENKINS putting his name on Statements of Probable Cause and other official BPD documents]. I was like, give me the motherfucker, I put my name on it . . . but then he was like, yo, this dude's good for at least two hundred [referring to $200,000], yo, we could get'em. I was like, ah right. He was like if we do it, you know, it'll be me and you, and I was like, alright, and G [referring to GONDO]. He was like yeah. And then I was like, well, what's up with the other dudes, your boys, you know [referring to HENDRIX, TAYLOR and WARD]. He was just like, nah, nah, they cool. I love them to death. Then he brought up the one where he, um, when they went outside and after everybody put up 20 dollars [meaning came away from the robbery with $20,000 each], you know what I'm talkin' about? Everybody was, he talked about the time where everybody had 20 g's [referring to $20 grand or $20,000].

GONDO responded, "you tellin' me he said that?" to which RAYAM then replied,

> He was just like, man, honestly, I [UI] even got that much. I put all that time and work, they [referring to HENDRIX, TAYLOR and WARD] was just with me, and I was like, you right. So I said you right, cause G [GONDO] knows, when I get something,' or if my name on it, I'm getting' the more, cause I'm the one, he was like, yup, you put so much time in it. So actually I think it should have been 60 [$60,000], 10 [$10,000], 10 [$10,000]and 10 [$10,000], that's what he said, or five [referring to $5,000 instead of $10,000] actually [referring to how the proceeds of a robbery should have been divided among JENKINS, and HENDRIX, TAYLOR and WARD]. I was like, I don't know about that. But, he was like, I'm tired of [UI]. I'm tired of doin' all this work. I was like, yo, that makes sense, yo. But, I'm gonna see what's up with this dude and shit. I told him, I asked him, how long you think it take to get us, 'cause you know, I need 50 grand right now [referring to $50,000]. So he say, how long you think its gonna

take. I was like a month, naw, we do it right, a couple of weeks. I was like, all right, I'll be hittin' him on them slash days you give us."

RAYAM then told GONDO, "I need a big one."

### Alerting One Another to Investigations into their Criminal Conduct

75. On October 5, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. The two were discussing how JENKINS had received information that the GTTF was under investigation. GONDO said that "people" had been saying GONDO was the "biggest drug dealer in the department because he has money." GONDO described how JENKINS had told him that JENKINS had heard that GONDO was on a wiretap. GONDO said JENKINS told him it could be the "Feds" referring to federal law enforcement investigating their illegal activities, and that the investigation could have been on-going for five years, to which GONDO responded, "what case? It's no Pablo Escobar. It's POLICE." GONDO then said, "King and Murray, it was like a year or 9 months, that's it, Sylvester, it was months, Nigga Richburg, it was months," referring to police officers, King, Murray, Sylvester and Richburg, who were prosecuted for robbing civilians and the amount of time that GONDO believed they were each under investigation.

21